# LIEBART, BAES, DUR-DEYN & Co.

## *againſt*

# The SHIP EMPEROR.

## *JUDGEMENT.*

THIS is a ſuit brought on a Bottom-ry Bond given by John Walſh to the li-bellants at *Oſtend,* whereby he hypothe-cates the ſhip Emperor, of which he was then the captain, for 4500 Florins, equal to £.409 - 1 - 9 ſterling money of Great Britain, advanced for repairs of the ſaid ſhip. Whereupon James Oellers the owner of this ſhip, and others his aſſignees, come in and anſwer to the li-bel, alledging that this Bottomry Bond

B                              ought

ought not to take effect *as an hypotheca-tion, according to the maritime law.*

THE power vested in a master of a vessel to impawn his owner's ship or goods for necessaries furnished in a foreign port, is a legal indulgence founded on the urgency of the case, and for the general benefit of commerce.

THERE are few rules of law more strictly defined than this of HYPOTHE-CATION, and none in which the reason and intention of the law are more manifest—It is thus delineated :

" A MASTER of a ship hath no power
" to take up money by bottomry, in
" places where his owner or owners
" dwell "—" But when a master is out
" of the country, and where he hath no
" owners, nor any goods of their's, nor
" of his own, and cannot find means to
" take up by exchange or otherwise, and
" that for want of money the voyage
" might be retarded or overthrown,
" monies may be taken up upon bot-
" tomry."—*Molloy,* Book II. chap. 11.
fect.

fect. 11.—" And the money so taken up
" by the master, is done upon great ex-
" tremity, and that for the completing
" of the voyage, when they are in dif-
" tress and want in some foreign parts."
—Sect. 12.

ALL the books agree in the spirit of
this doctrine. The extreme necessity
appears, every where, to be the *reason*
of the law, and the *intention,* to favour
commerce.

LET us now take a view of the cir-
cumstances of the present case.

THE leading facts appear, from the
testimony exhibited, to be these.

THE ship Emperor, *John Walsh* mas-
ter, belonging to *James Oellers* of Phila-
delphia, sailed for Ostend with a cargo
of tobacco on board; the ship and cargo
being consigned by the owner to *Bine,
Overman,* and *Company,* merchants at *Of-
tend.* This ship was so damaged by a
storm at sea, that the captain was oblig-
ed to put into the port of Dover, in
England,

England, in diftrefs. The captain, on his arrival at Dover, immediately fent notice of his fituation to the confignees at Oftend, and they fpeedily furnifhed him with a credit on London, from which he raifed money fufficient to refit his fhip. After this, he failed for and arriv-ed at *Oftend,* where the confignees took charge of the fhip and cargo.

BEFORE the veffel arrived at *Oftend,* Bine, Overman and Company had ac-cepted bills, to a confiderable amount, drawn upon them by Oellers, on the credit of this confignment. Upon clof-ing all accounts, Bine, Overman and Company found that *Oellers* had not only drawn upon them to the full amount of the cargo and freight (" the tobacco not felling fo well as was expected"), but that there remained a confiderable balance in their favour. To fecure this balance, they tell captain Walfh that he fhall not leave the port, and even threaten to at-tach the fhip, unlefs he will repay them the monies advanced at Dover for re-pairs, or hypothecate the fhip for fecu-rity.

rity. It was not in captain Walfh's power to do the one, that is, to repay the money, and he declined the other propofal for fome time. But finding expences accumulating, and that he could not fail without fome accommodation, he at laft confented to hypothecate the fhip. Bine, Overman and Company then recommended him to Liebart, Baes, Durdeyn and Co. telling him that *they* would lend money on bottomry ; and conducted him to their houfe, where he executed the bottomry bond, now in queftion. But no money was paid to Walfh ; for the bills for repairs, for which the fhip was hypothecated, had long fince been difcharged by the produce of the credit on London.

AFTER this, Bine, Overman and Company permitted captain Walfh to fail, and in due time he arrived in the port of Philadelphia.

DURING thefe tranfactions, *Oellers* had failed, and affigned this fhip to his creditors, and the queftion now is, Whether this bottomry bond fhall operate to

the

the exclufive fecurity of the merchants at Oftend againft all other creditors, as a genuine hypothecation would do, on the principles of maritime law.

AFTER a careful confideration of thefe circumftances, I cannot difcover one real feature of that rule of law which fhould be the ground of the prefent fuit. True it is that the fhip was in neceffity, and fo is every fhip that wants effential repairs. But the owner had credit within reach. The confignees were not far diftant. The application was eafy and certain, and the confignees no fooner heard of the difafter but they furnifhed the means of relief. In fact, Bine, Overman and Company had the ftrongeft inducements to exert themfelves in getting the fhip repaired at Dover, to enable her to get round to Oftend, for they had made themfelves anfwerable for Oeller's bills, upon the credit of this cargo; it was, therefore, of great importance to them that the cargo fhould arrive fafe to their hands. So that, inftead of advancing money

money to a diftrefs'd ftranger, they were only taking care of their own fecurity. This motive is manifefted by their letter to Walfh at Dover, and ftill further by their fubfequent conduct ; for, after they had difpofed of the cargo, and found a balance due from Oellers to them, they infift that Walfh fhall not fail unlefs he will hypothecate the fhip to Liebart, Baes, Durdeyn and Co. which, from all appearances, feems to be the fame thing as hypothecating her to themfelves. For the captain received no money from Liebart, Baes, Durdeyn and Co. who were not at all interefted in the tranfaction, and whofe names were only made ufe of to fave appearances ; for Bine, Overman and Company well knew that, being confignees, the captain had no power to hypothecate the veffel to them. And, in order to give the bottomry bond the appearance of a genuine hypothecation, they felect from the general account the monies fpent in repairs at Dover, and compel the captain to hypothecate the fhip, *as for thofe particular*

*ticular charges,* to the libellants, who had not advanced one shilling towards that expence.

FURTHER, if we look into the accounts we shall find, that although this voyage was not a very successful one, yet the ship cleared all charges accrued since she sailed from Philadelphia, even including the repairs at Dover. But Oellers had drawn upon Bine, Overman and Company on the credit of the future voyage, long before the vessel sailed from Philadelphia, to raise money to fit her out, and it is these drafts brought into account which make a balance due to the consignees. So that, instead of an hypothecation made to enable a ship to complete her voyage, it was, in fact, made to enable her owner to begin one. Which was never the object of the maritime law in cafes of hypothecation. Neither was this law ever designed to give partial advantages in mercantile connections, or intended to secure the balance of a running account between owners and consignees.

THE

THE importance of the prefent decifion to the commercial character of our country, has been ftrongly urged, in favour of the libellants. But I am not apprehenfive on this account. The queftion in view is not to be determined by any municipal law of the country, but by a general law, univerfally received and underftood. And I am of opinion, that our national character would much more fuffer by an adjudg'd precedent, which might open a door for dangerous collufions, by putting it in the power of captains of veffels to faddle their owners with unneceffary engagements, or to give an unfair advantage to foreign creditors, by a fraudulent ufe of that preeminent lien which the law lays on a fhip and goods properly hypothecated.

I DO not mean to fuggeft that there has been any fraud or collufion in the prefent cafe. It is enough that I do not find the claim of the libellants within the fpirit or intention of the maritime law.

C                    AND,

AND, therefore, I adjudge that the bill be difmifs'd, and that the libellants pay the cofts of fuit.

July, 1785.

---

*FROM this decifion there was an Appeal to the High Court of Errors and Appeals. The caufe was again argued there, but the judgment of the Court of Admiralty was confirmed.*

*THE following notes, taken at the time, contain the fubftance of the judgment given in the High Court of Errors and Appeals in the above caufe.*

October 3, 1785.

THE Court obferved,——That the power of a mafter to hypothecate his owner's fhip was a neceffary, but fome-times a dangerous power—the Court was unwilling to extend this power farther than the law ftrictly authorifed—A genuine

nuine hypothecation ought to be the voluntary act of the mafter at the time when, and in the place where, the monies were advanced for neceffaries or repairs—The money advanced ought to be folely on the faith of the hypothecation, and not on any perfonal credit.— Thefe are incontrovertible principles— the prefent cafe not applicable to them. Although the hypothecation was made to Liebart, Baes, Durdeyn and Company, yet it was to fecure monies advanced by Bine, Overman and Company, the configners—No authority fhewn, and none can be fhewn, becaufe none ought to be, that an hypothecation can be made to a configner—great mifchiefs might arife if captains could hypothecate to configners—No authority produced to prove that an hypothecation can be made in any port but that in which the veffel firft arrives after the diftrefs and damage fuftained—Bine, Overman and Company did not repair the veffel on the faith of the hypothecation —but this hypothecation was made to
fecure

fecure to confignees the balance of a running account.

THE Court unanimous in confirming the fentence of the Admiralty.